NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| WANDA STEVENSON, | : | **Civil Action No. 20-18722-EP-AME** |
|  | : |  |
| Plaintiff, | : | **OPINION and ORDER** |
|  | : |  |
| v. | : |  |
|  | : |  |
| CITY OF NEWARK, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**ESPINOSA**, Magistrate Judge

     This matter is before the Court on the motion filed by defendant Ras Baraka, named in his official capacity as the mayor of co-defendant City of Newark ("Mayor Baraka" or "the Mayor"), for a protective order barring his deposition under Federal Rule of Civil Procedure 26(c) [D.E. 74]. Plaintiff Wanda Stevenson ("Plaintiff") opposes the motion. The Court has considered the parties' written submissions and heard oral argument on February 9, 2024. For the following reasons, Defendants' motion is granted in part and denied in part.[1]

### I.    BACKGROUND

#### A.    Factual Allegations

     Plaintiff, identified in the Complaint as a "female Christian African-American," is an employee of the City of Newark. (Compl. ¶¶ 1, 3.) She filed this employment discrimination action on December 10, 2020, alleging a continuing pattern of harassment, retaliation, and hostile work environment on the basis of her race, religion, and gender, in violation of the federal

---

[1] Movants City of Newark and Mayor Baraka are referred to herein collectively as Defendants.

Civil Rights Act, the New Jersey Civil Rights Act, and the New Jersey Law Against

Discrimination. She also asserts a whistleblower claim under New Jersey's Conscientious

Employee Protection Act. Fact discovery in this action is largely complete, with the exception of

the noticed deposition of Mayor Baraka. The following factual summary focuses on the matters

pertinent to this motion.[2]

Plaintiff has worked as the Chief Sanitation Inspector for the City of Newark since May

1994, when she became the first female employee to hold that position. She alleges that, over the

course of various years and continuing to the present, she has been subjected to unlawful,

adverse actions and harassment by one or more of her superiors: defendant Thomas McDonald,

the Chief Code Enforcement Officer in Newark's Department of Engineering; defendant Phillip

Scott, the Director of the Department of Engineering; and defendant Khalif Thomas, the Director

of the Department of Public Works ("DPW"). Although the Division of Sanitation falls within

the DPW, Plaintiff has at various times been directly and/or indirectly supervised by McDonald,

Scott, and Thomas.

According to the Complaint, the alleged pattern of unlawful discrimination began after

Plaintiff, acting in her capacity as president of the labor union local for city employees,

challenged the City of Newark's appointment of McDonald to the position Chief Code

Enforcement Officer, in or about April 2012, contending it violated civil service standards.

(Compl. ¶ 24.) While the Complaint sets forth a number of alleged acts of harassment and

retaliation, many if not most are attributed directly to McDonald. Among other things, Plaintiff

alleges McDonald (1) used obscene, sexually graphic, and racially offensive language in her

---

[2] This factual summary, drawn from the allegations of the Complaint and Plaintiff's deposition testimony, provides context and foundation for this discovery motion. While the Court's decision is based on the record presented by the parties, nothing herein shall constitute a conclusive finding of fact or a definitive assessment of the weight of the evidence.

presence, despite her requests that he refrain from doing so; (2) caused Plaintiff's team of sanitation inspectors to be reassigned away from her supervision in or about September 2015, leaving her without a staff for a period of time; (3) directed that all of Plaintiff's belongings and office materials be removed from her office and placed into a filing room in or about early 2016 and thereafter denied her a key to the building for over three months; and (4) ordered Plaintiff to initiate dismissal of summonses issued by her Sanitation Unit or otherwise caused the summonses to be dismissed through other means. (*Id.* ¶¶ 25-28.)

This latter activity, concerning summonses issued by Plaintiff for sanitation violations and McDonald's alleged interference with their enforcement, forms a critical part of the alleged harassment and basis for retaliation. Plaintiff asserts many if not most of the summonses that drew attention from McDonald and others in Mayor Baraka's administration were issued by her unit for sanitation ordinance violations by "large apartment buildings in the South Ward of Newark, which Baraka served [as city council member] before becoming mayor." (Pl. Br. at 1.) She alleges McDonald directed the summonses be dismissed "without justification, but rather for political favoritism, and [asked her] to falsely state under oath that the summonses were issued in error," so as to avoid penalizing supporters of Mayor Baraka. (Compl. ¶¶ 31-32.) According to the Complaint, despite Plaintiff's persistent refusal of "McDonald's directives either to perjure herself or to dismiss validly issued summonses," McDonald caused hundreds of sanitation violation complaints to be dismissed in 2017 and 2018. (*Id.*) At her deposition, Plaintiff elaborated on these allegations. When asked whether McDonald gave her an explanation for why sanitation violation cases are being dismissed, she testified: "Sometimes he would say because this is what the mayor wants or they're political contributors or, you know, something to that effect. Then sometimes he would just say 'Because I said so.'" (Pl. Dep. 187:11-18.)

The Complaint alleges that interference with Plaintiff's duties as Chief Sanitation Inspector, deliberate efforts to undermine her authority in that role, and retaliation for her issuance of certain summonses continued throughout 2018 and 2019. In or about September 2019, the Complaint asserts department directors Thomas and Scott "orchestrated the transfer of Plaintiff's five-person Sanitation Inspections team from the Department of Public Works to the Department of Engineering, under the direct supervision of Defendant McDonald." (Compl. ¶ 34.) Upon this transfer, McDonald, the Complaint further alleges, "immediately engaged in a continuous pattern of behavior designed to humiliate, intimidate, demoralize, and undercut" Plaintiff's authority, including stripping her and her team of vehicles needed to perform their job, instructing Plaintiff's team to disregard her directives, imposing a five-summons-a-day limit on the inspectors, and excluding her from meetings. (*Id.* ¶¶ 35-36.) The Complaint states Plaintiff was transferred back to the DPW and to the supervision of its director, Thomas, only after she filed an affirmative action complaint in September 2019, accusing McDonald of retaliation, harassment, and hostile work environment. (*Id.* ¶ 37.) Moreover, Plaintiff alleges that Thomas himself "directed his own pattern of abusive behavior toward Plaintiff, including verbally abusing Plaintiff and disparaging Plaintiff to others." (*Id.* ¶ 38.) According to the Complaint and Plaintiff's deposition testimony, similar retaliatory and harassing conduct by McDonald and Thomas continued through the date the Complaint was filed, in December 2020, and into 2022.

**B.   Meetings Between Plaintiff and Mayor Baraka**

In the midst of the foregoing events, Plaintiff had two in-person meetings with Mayor Baraka. (Pl. Dep. 162:14.) These meetings between Plaintiff and Mayor Baraka drive her request to depose him in connection with her claims in this action. A summary of Plaintiff's deposition testimony about the meetings follows.

4

The first meeting occurred in March 2016, when Plaintiff met with Mayor Baraka "to complain about the abusive, discriminatory, and retaliatory treatment she ha[d] been subjected to by defendants." (Compl. ¶ 29; Pl. Dep. 162:14-20.) She sought this meeting only after officials in her chain of command failed to address her grievances. (Pl. Dep. 164:24-165:8.) In her sworn deposition testimony, Plaintiff recounted the details of the March 2016 meeting.

Plaintiff met with Mayor Baraka in his office at City Hall, recalling they were the only two people in attendance. (*Id.* 163:5-12.) Plaintiff informed Mayor Baraka that her office space was constantly being relocated and complained about the criticism and unlawful meddling, particularly by McDonald, concerning her sanitation violation summonses, testifying she told the mayor she was "always getting feedback, because summonses that I issued to individuals that are campaign contributors or friends of friends." (*Id.* 162:14-21.) Plaintiff expressed that she no longer "want[ed] to work under McDonald because of . . . his illegal practices." (*Id.* 162:22-24.) The Mayor responded to Plaintiff's comments by stating he understood she did not want to work with McDonald because she did not like him, to which Plaintiff reiterated that her complaints had to do with ethics and professionalism, not her personal preferences. (*Id.* 164:5-10.) She also informed Mayor Baraka that city employees Ronald Snead and former DPW Director Talib[3] told her that the Mayor's Chief of Staff (and brother), Amiri Baraka, believed Plaintiff "would be better controlled under McDonald." (*Id.* 164:12-14, 168:20-22.) Plaintiff testified that Mayor Baraka began texting as she was speaking, and after she related what she had heard about the Chief of Staff, the Mayor paused from texting and informed her: "'My brother said he doesn't know you.'" (*Id.* 164:15-16, 166:7-17.) Plaintiff took this comment as a sign the meeting was no longer professional in nature and had therefore concluded. (*Id.*) Without further discussion, she

---

[3] Plaintiff recalled that defendant Khalif Thomas became the DPW Director in or about August 2017. (Pl. Dep. 179:4-11.)

left the Mayor's office. Plaintiff further testified that, after this meeting, in or about April 2016, her team of Sanitation Unit inspectors was, for a short period, reassigned back to her and the Unit's physical location was moved back into the DPW. (*Id.* 170-71; *see also* Compl. ¶ 29.) Although Plaintiff was "moved back into DPW [she was] then shortly moved back out again." (Pl. Dep. 167:12-13.)

The second meeting between Plaintiff and Mayor Baraka focused on what Plaintiff perceived to be the deliberate and targeted dismissal of sanitation summonses issued by Plaintiff and her team, particularly against the South Ward properties associated with Mayor Baraka's political supporters. Again, the meeting occurred in the Mayor's office, and only she and Mayor Baraka were present. (Pl. Dep. 213:3-9, 215:14-17.) Plaintiff could not recall the exact date of this meeting (*id.* 213:10-15), but believed it occurred before she was asked not to attend court proceedings as a representative of the DPW concerning the sanitation summonses. (*Id.* 207:23-209:10.) She further recalls she was "banned" from the courtroom some time in 2018. (*Id.*)

Regarding the substance of her second meeting with Mayor Baraka, Plaintiff testified that she expressed her concern with the lack of professionalism in how the summonses were being handled in court, specifically insofar as she was aware they were being dismissed to curry political favor with the ticketed parties or perhaps unlawfully. (*Id.* 210:4-211:11.) She related the details of her conversation with the Mayor as follows:

> Q.    Was the meeting with the mayor about people receiving money or favors in exchange for dismissing cases?
>
> A.    I don't believe I said it in that exact way.
>
> Q.    Okay.
>
> A.    I believe I said that "Cases are being dismissed and they are being dismissed based on what you or the chief of staff want. The cases are being dismissed because these are people that contribute to your

campaign or they contribute to the Shani Baraka Center," you know, "This
is what is being said" or "People are being paid to dismiss tickets." That
was the conversation . . ..

(*Id.* 212:2-16.) She informed Mayor Baraka about a specific sanitation violation case involving a

property on King Boulevard, in which a $17,000 fine was settled for $1,500. Plaintiff told the

Mayor that, while she was in the courtroom, she witnessed a conversation between Newark

Corporation Counsel Willie Parker and a prosecutor assigned to the case, in which Parker

informed the prosecutor that "Mitty [Amiri Baraka] wants this case dismissed" and "Mitty

agreed that the case would be settled for $1,500." (*Id.* 215:18-216:18.) She also informed the

Mayor of another incident she witnessed in which city employee Rahaman Muhammad

interrupted a court proceeding to insist that the responding party in that case, involving another

South Ward property, "'shouldn't have gotten a ticket' and that it 'should be dismissed.'" (*Id.*

222:2-12.) Plaintiff testified that, at this meeting, she simply wanted to make Mayor Baraka

aware that, in her view, his staff was behaving unethically regarding sanitation summonses. (*Id.*

216:19-218:6.) However, according to Plaintiff, Mayor Baraka denied knowing about these

events and denied knowing the people involved in them. (*Id.* 222:13-23.) At this point, the

meeting concluded. (*Id.* 222:24-223:2.) Plaintiff testified that, as she was leaving Mayor

Baraka's office, Rahaman Muhammad was walking in. (*Id.* 220:8-24.)

    **C.**    **McDonald's Email Regarding Sanitation Summonses**

    In the course of discovery, Plaintiff produced a copy of an email she received from

McDonald, copied to Mayor Baraka, concerning her issuance of sanitations summonses. The

email is a key piece of evidence on which Plaintiff relies in arguing the deposition of Mayor

Baraka is warranted. Thus, a description of that document bears inclusion in this factual

background.

The email, dated Monday, February 12, 2018, was sent by McDonald to Plaintiff and

Tamara Ellis, with the subject line "Southward Tickets Issued – January 1-7, 2018 (Renner

Avenue)." (Pl. Br., Ex. B.) It states:

> Officers Stevenson & Ellis:
>
> Please forward copies or a list of tickets via-email issued as
> indicated by close of business Tuesday – 13th February 2018.
>
> Thanks

(*Id.*) The email is copied to Mayor Baraka, Khalif Thomas, and Phillip Scott. Plaintiff replied to

all recipients on February 13, 2018, with a list of tickets issued to nine properties on Renner

Avenue, all located in Newark's South Ward.[4]

### D.    Plaintiff's Request to Depose Mayor Baraka

Plaintiff noticed Mayor Baraka's deposition in the regular course of fact discovery, and

an incipient dispute arose over whether that deposition could proceed. Addressing that issue, the

Court concluded it was premature to resolve before other sources of discovery had been

explored. It instructed Plaintiff to first pursue written discovery and, thereafter, to depose all

other fact witnesses before reassessing whether there remained a need to proceed with Mayor

Baraka's deposition. (*See* Orders at D.E. 46, 66, 68.)

Fact discovery is now nearly concluded. The parties have engaged in extensive written

discovery, producing documents and responding to interrogatories, including responses served

by Mayor Baraka. Plaintiff has been deposed, and she has deposed five individuals: Defendants

Thomas and Scott; City of Newark Director of Personnel Tiffany Stewart; Chief Municipal

Prosecutor Herbert Washington; and former Affirmative Action Officer Manager David

---

[4] *See* Official Ward Map 2011-2012 (Revised), as established by the Newark Ward Commissioners, Office of
the City Clerk, City of Newark, Essex County, New Jersey. https://libguides.rutgers.edu/ld.php?content_id=
60045375.

Muhammad. (*See* Joint Dispute Ltr., Dec. 21, 2023, D.E. 69.) Although noticed by Plaintiff, the deposition of Defendant McDonald was canceled due to a medical emergency, and it appears that, because of a serious health condition, McDonald will not be able to provide deposition testimony. (*See* Joint Status Ltr., Jan 4, 2024, D.E. 70.)

In December 2023, upon completion of the foregoing discovery, Plaintiff renewed her request to take Mayor Baraka's deposition. Defendants objected. Although the parties met and conferred in an effort to resolve their dispute, they were unable to reach an agreement and filed a joint dispute letter on December 21, 2023, seeking a decision by the Court concerning whether the deposition may proceed. The Court considered the dispute letter and, concluding that supplemental briefing was required, directed Mayor Baraka to file this motion for a protective order pursuant to Rule 26(c).

## II.    DISCUSSION

### A.    Legal Standard

Because this motion focuses on the permissibility of requested discovery—the deposition of defendant Mayor Baraka—the Court's analysis begins with an acknowledgement of the broad scope of discovery under Federal Rule of Civil Procedure 26. That Rule provides that a party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1); *see also Pacitti v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999) (holding it is "well recognized that the federal rules allow broad and liberal discovery"). Generally, under Rule 26, "all relevant material is discoverable unless an applicable evidentiary privilege is asserted." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000). However, while discovery is broad, it is not unlimited. *Robbins v. Camden City Bd. of Educ.*, 105 F.R.D. 49, 55 (D.N.J. 1985). To avoid abuses of the liberal scope of

permissible discovery, Rule 26 requires a Court to restrict or disallow discovery if it determines that the material sought is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2). Moreover, Rule 26(c) authorizes the Court, for good cause shown, to issue an order limiting discovery or forbidding inquiry into certain matters "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c); *see also Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (holding "it is well established that a party wishing to obtain an order of protection over discovery material must demonstrate that 'good cause' exists for the order of protection."). The party seeking a protective order bears the burden of establishing that "disclosure will work a clearly defined and serious injury" on that party. *Pansy*, 23 F.3d at 786.

Initially, the burden of demonstrating that discovery may be obtained falls on the requesting party. *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). Generally, that burden simply entails establishing that the requested information meets the broad relevance and proportionality requirements of Rule 26. However, where, as here, a party seeks to take the deposition of a high-level government official, there is a presumption against permitting the deposition to proceed, consistent with *United States v. Morgan*, in which the Supreme Court expressed concern with protecting high-ranking government officials from "the effects of nettlesome mind-probing." 313 U.S. 409, 422 (1941). This principle, known as the *Morgan* Doctrine, has been interpreted to hold that "[a]bsent extraordinary circumstances, good cause exists to preclude the deposition of a high-level government official." *Buono v. City of Newark*, 249 F.R.D. 469, 470 n. 2 (D.N.J. 2008); *see also 8 Erie St. JC LLC v. City of Jersey Cit*y, Civ. No. 19-9351, 2023 WL 3735949, at *3 (D.N.J. May 31, 2023) (citing various decisions by

10

Courts in the District of New Jersey applying the *Morgan* Doctrine). Although the Third Circuit

has not published a precedential opinion addressing this issue, "there is wide agreement among

the Circuits that current high-ranking government officials should not be subject to the taking of

depositions absent extraordinary circumstances." *United States v. Sensient Colors, Inc.*, 649 F.

Supp. 2d 309, 316 (D.N.J. 2009).

Whether extraordinary circumstances exist within the meaning of the *Morgan* Doctrine

must be evaluated on a case-by-case basis. *Id.* at 322. To do so, courts in this District employ a

test articulated in *Buono v. City of Newark*, a case in which then Magistrate Judge Patty Shwartz,

now a Circuit Judge on the Third Circuit Court of Appeals, was presented with a plaintiff's

motion to compel the deposition of a city mayor. *See* 249 F.R.D. at 470 n.2 (citing *Bogan v. City

of Boston*, 489 F.3d 417, 423-24 (1st Cir. 2007)); *see also 8 Erie St.*, 2023 WL 3735949, at *4;

*Sensient Colors*, 649 F. Supp. 2d at 322. Under the *Buono* test, the party seeking the deposition

must demonstrate:

> (1) the official's testimony is necessary to obtain relevant information
> that is not available from another source; (2) the official has first-hand
> information that cannot reasonably be obtained from other sources; (3)
> the testimony is essential to the case at hand; (4) the deposition would
> not significantly interfere with the ability of the official to perform his
> government duties; and (5) the evidence sought is not available through
> less burdensome means or alternative sources.

*Sensient Colors*, 649 F. Supp. 2d at 322 (citing *Buono*, 249 F.R.D. at 471 n.2).

The five-prong inquiry sets forth overlapping factors typically considered in groups. *Id.*;

*8 Erie St.*, 2023 WL 3735949, at *4 (noting interrelated factors "need not be addressed in order

or in isolation"). For example, in *Sensient Colors*, the Court considered factors 1, 2, and 5

together, noting they were all directed to the critical question of whether the government official

had personal involvement or knowledge relevant to the case. *Sensient Colors*, 649 F. Supp. 2d at

11

322. Other Courts have followed *Sensient Colors* and applied the *Buono* test by first addressing the personal involvement/knowledge factors and then proceeding to consider factors 3 and 4. *See 8 Erie St.*, 2023 WL 3735949, at *4; *Goldrich v. City of Jersey City*, No. 15-885, Mem. Op. and Order, at 5 (D.N.J. Feb. 1, 2017) (citing *Sensient Colors* and noting that factors 1, 2, and 5 must necessarily come "to the forefront of the inquiry" because they all "focus on the deponent's level of personal knowledge or involvement").

### B.      Analysis of *Buono* Factors

Consistent with the approach taken by other courts in this District, this Court organizes its analysis of the *Buono* factors into three groups, to determine whether Plaintiff has shown that extraordinary circumstances warrant permitting her to depose Mayor Baraka.

#### 1.    Relevant, personal knowledge not available from another source

Plaintiff argues her meetings with Mayor Baraka, together with the surrounding circumstances, establish that he has relevant, firsthand knowledge not available from another source. She asserts that, in those meetings, she discussed with the Mayor the acts of discrimination and retaliation giving rise to this action, particularly as the conduct relates to her issuance of sanitation summonses to properties in Newark's South Ward, which the Mayor represented when he was on the City Council. Plaintiff argues Mayor Baraka was made aware that she was being subjected to repeated office moves, reassignments, and other alleged harassment by various Newark officials and that McDonald and others were engaged in allegedly unlawful and/or unethical behavior in retaliation for her issuance of summonses to his political supporters and friends.

More important, Plaintiff stresses she informed Mayor Baraka at these meetings that she learned from others working in his administration that the interference in her work as Sanitation

Unit Chief—particularly, dismissal of summonses she issued—was undertaken at the Mayor's direct or indirect behest. As additional indicia of Mayor Baraka's personal knowledge of the alleged retaliation against Plaintiff for issuing summonses to his campaign contributors and/or refusing to dismiss those she had issued, Plaintiff points to McDonald's access to Mayor Baraka and his brother and Chief of Staff, Amiri Baraka, and to her temporary assignment out of McDonald's direct supervision in April 2016, very shortly after her first meeting with the Mayor. Finally, Plaintiff relies on the February 12, 2018 email from McDonald to Plaintiff, copied to Mayor Baraka, seeking specific summonses issued to properties in the South Ward, as evidence demonstrating the Mayor's knowledge of and interest in Plaintiff's issuance of tickets to his supporters, the very conduct Plaintiff claims prompted retaliation against her and about which she expressly complained in both her meetings with the Mayor. Only Mayor Baraka, Plaintiff argues, would be in possession of relevant information concerning his role, if any, in the matters discussed at those meetings and, moreover, any actions he may have taken in response to the concerns Plaintiff expressed.

Opposing Plaintiff's request to depose Mayor Baraka, Defendants argue that Plaintiff fails to satisfy *Buono* factors 1, 2, and 5 because she has not demonstrated that Mayor Baraka was involved, directly or indirectly, in any of the alleged wrongdoing on which her claims are based. They stress that none of the documents produced in discovery nor any testimony given by numerous, lower-ranking city officials show Mayor Baraka participated in or directed the alleged actions underlying Plaintiff's Complaint. Defendants do not dispute that the meetings between Mayor Baraka and Plaintiff occurred, but they argue that these discussions do not put him in a position of having personal, firsthand information about the alleged retaliatory, discriminatory, and otherwise unlawful conduct of which Plaintiff complains in this action.

Defendant likens the circumstances here to those in *Buono*, in which the plaintiff met with the then-serving Newark mayor on four occasions to discuss retaliatory conduct by officials in his administration. 249 F.R.D. at 471 n.1. Applying the *Morgan* Doctrine, the Court in *Buono* concluded the meetings at issue did not suffice to establish the mayor had firsthand knowledge of the relevant facts, noting there was no indication he had played any role in the events about which the plaintiff complained, and thus denied the plaintiff's request to compel his deposition. *Id.* at 472 n.2. Defendants maintain that, where a plaintiff merely suspects a government official may have firsthand knowledge about the relevant facts, the request to depose the official fails to meet the *Morgan* Doctrine's exceptional circumstances standard. *See, e.g., Goldrich*, No. 15-885, at 8-9 (finding plaintiff failed to point to any evidence the Jersey City mayor had a "concrete link" to the retaliatory assignment of which the plaintiff complained or had unique information, unavailable from other sources); *Johnson v. State of New Jersey*, No. 12-4850, 2015 WL 4915611, at *4 (D.N.J. Aug. 18, 2015) (rejecting plaintiff's "vague and unsupported" allegations about the deponent's involvement in the alleged discriminatory acts as insufficient to satisfy the second factor of the *Buono* test); *Robinson v. City of Phila.*, No. 04-3948, 2006 WL 1147250, at *3 (E.D. Pa. Apr. 26, 2006) (denying request to depose the mayor in a case involving claims of wrongful discharge, civil rights violations, and a state whistleblower statute because there was "no evidence directly or inferentially suggest[ing] that [the mayor] ha[d] personal knowledge" of the incident at issue). Defendants argue that, as in *Buono* and the other cases on which they rely, Plaintiff's request to depose the Mayor here falls short of the *Morgan* Doctrine's extraordinary circumstances requirement, as it is based solely on two conversations she had with Mayor Baraka and her mere supposition that he was involved in the office

relocations, alleged discriminatory behavior, and other harassment she claims, particularly insofar as the conduct relates to her issuance of summonses for sanitation violations.

The Court disagrees with Defendants' assessment of the evidence. Through her sworn testimony about the matters discussed with Mayor Baraka, the timing of their meetings, and the surrounding incidents, Plaintiff has demonstrated that the Mayor possesses unique, firsthand information relevant to the allegations underlying her claims. Discovery concerning the Mayor's recollection of his meetings with Plaintiff and his actions or directions, if any, prompted by the complaints Plaintiff raised would be both relevant and unavailable from another source. Plaintiff testified that at both the April 2016 meeting and the later meeting in or about 2018 she informed Mayor Baraka of precisely the alleged wrongdoing giving rise to this action. Of course, mere awareness by a high-ranking government official will not suffice to warrant a deposition, but the record here goes beyond secondhand knowledge about what other city employees may or may not have done. According to her sworn testimony, Plaintiff spoke with Mayor Baraka to inform him of serious wrongdoing, if assumed true, by other officials in his administration, including department heads and individuals with whom he had direct and frequent communication— including the Mayor's brother and Chief of Staff, Amiri Baraka. The meetings occurred contemporaneous with the ongoing, alleged harassment and retaliation, particularly interference with Plaintiff's sanitations summonses by McDonald and others, her office relocations, and her chain of command reassignments. In fact, Plaintiff notes she was moved away from McDonald's supervision almost immediately after her April 2016 meeting with the Mayor and then, within weeks, reassigned to McDonald. Moreover, the February 12, 2018 email strongly suggests McDonald was keeping Mayor Baraka apprised of Plaintiff's summons issuing activity, further contributing to the possibility, if not the likelihood, that the Mayor had some level of oversight

15

and communication concerning the matters Plaintiff raised in her meetings with him, and which are at issue in this action.

Of course, by this evaluation of the evidence relevant to Plaintiff's deposition request, the Court suggests no conclusion whatsoever concerning whether Mayor Baraka directed or was an active participant in the misconduct underlying Plaintiff's claims. Yet, that level of personal involvement is not what the *Buono* test requires; rather, the question before the Court at this step of the analysis is whether the party requesting the deposition has shown the government official has firsthand knowledge of relevant facts, unavailable from another source. Here, as to the limited topics of the one-on-one meetings between Plaintiff and Mayor Baraka and any discussions, decisions, or actions the Mayor may have taken in anticipation of or in response to those meetings, the answer is yes.

Although Defendants rely heavily upon *Buono* for the proposition that mere meetings with a high-ranking government official, even about the incidents underlying a plaintiff's complaint, do not establish the official's possession of unique, firsthand knowledge, as required to overcome the *Morgan* Doctrine's presumption, the facts of *Buono* are distinct from those here in a critical regard. In *Buono*, the mayor's knowledge consisted solely of secondhand information provided by Plaintiff, and perhaps others, of previous misconduct by employees of a former mayor's administration, whereas, here, the meetings between Plaintiff and Mayor Baraka about the alleged misconduct occurred contemporaneously with that alleged misconduct. *See Buono*, 249 F.R.D. at 471 n.2 (noting it was undisputed that "the events at issue occurred before the deponent became Mayor").

This factual distinction figures prominently in *Buono*'s analysis. Finding the plaintiff had failed to meet his burden to compel the mayor's deposition, the Court in *Buono* reasoned:

> First, there is no allegation that the deponent played any role in the events about which plaintiff complains. The deponent did not work for the City of Newark at the time of the alleged activity and played no role in the alleged retaliatory activity . . . [T]he deponent was not an alleged actor in any of the events, potentially liable for any wrongdoing, or even in a position to [be] privy to discussions with those who allegedly disciplined plaintiff.

> Second, there is nothing to show that the deponent has personal knowledge of the events that could not be gleaned from others. Because the deponent did not work for the City at the time of the events in question, any information about how the plaintiff was allegedly treated had to have come from other sources.

*Id.*

In contrast, in this action, Plaintiff complained to the current mayor about allegedly discriminatory, retaliatory, and unlawful conduct by members of his own administration, as it was occurring. She informed Mayor Baraka that people with direct involvement in the alleged retaliation against her did so, in her view, for issuing sanitation summonses to the Mayor's political supporters and, further, that they advised Plaintiff that they were fulfilling the Mayor's wishes. Plaintiff has proffered evidence concerning the close, professional relationship between the individuals directly involved in the conduct at the core of her claims and Mayor Baraka, the timing of certain actions in relation to her meetings with the Mayor, and McDonald's email about Plaintiff's sanitations summonses, copied to the Mayor

Additionally, Plaintiff has shown there is no less burdensome means than deposing the Mayor about those topics. At this late point in discovery, Plaintiff has deposed all other available witnesses, yet none possessed information about the one-on-one meetings between Plaintiff and the Mayor nor of any discussions or actions in anticipation of, or resulting from, those meetings. Plaintiff also pursued written discovery from the Mayor, which yielded no meaningful information. Certain of the interrogatories Plaintiff served on Mayor Baraka sought information

17

concerning topics she asserts she discussed in her meetings with him. Mayor Baraka denied knowledge of those matters. To be sure, the Mayor's stated lack of knowledge concerning those topics does not, in and of itself, warrant a deposition. However, in the absence of other lower-level witnesses from whom Plaintiff might obtain the information she seeks, and the Mayor's blanket written denials, there appears no less burdensome means available for Plaintiff than for her to be permitted to test the Mayor's recollection, under oath, in a deposition.

In sum, the Court finds Plaintiff has presented sufficient circumstantial evidence to give rise to the inference that Mayor Baraka has unique, personal knowledge of any decisions, actions, and/or discussions he may have had in preparation for, or in response to, the complaints raised to him by Plaintiff in their two meetings. The Court can identify no less burdensome, feasible means than a deposition to explore those topics. For the foregoing reasons, the Court is satisfied that Plaintiff has established factors 1, 2, and 5 of the *Buono* inquiry.

### 2. Essential Nature of Testimony

Plaintiff argues the Mayor's deposition testimony is essential to her case because it will shed light on the crux of her claims—for unlawful retaliation and harassment, in violation of state and federal laws against workplace discrimination and the New Jersey whistleblower statute—that she was subject to mistreatment and retaliation for refusing to dismiss the sanitation violations she issued, in particular those directed to properties in Newark's South Ward. Plaintiff bases this argument primarily on her testimony that Mayor Baraka had instructed others to see that the summonses were not prosecuted. Defendants, in opposition, maintain that Plaintiff's argument is based on pure conjecture and that she fails to establish that Mayor Baraka would supply any evidence related, much less essential, to her claims.

In support of their competing views, both sides rely on a case decided in this District, *Sensient Colors,* an action brought by the federal government for recovery of environmental clean-up costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. 649 F. Supp. 2d at 313. In that case, the Environmental Protection Agency ("EPA") had spent multiple years and sixteen million dollars removing contaminants from a site in Camden, New Jersey, which it alleged defendant Sensient Colors was responsible for contaminating. *Id.* The defendant subpoenaed the deposition of, among others, former EPA official Jane Kenny, but upon a motion to quash, the Magistrate Judge concluded the deposition was not warranted under the *Morgan* Doctrine. *Id.* at 323. The District Court reversed, finding Kenny's deposition was warranted under the *Buono* factors. *Id.* at 324-326. Concerning the third *Buono* factor, whether the official's testimony was essential, the Court noted that one email produced in discovery named the official "as a crucial person in executing the cleanup at the Site" and indicated she had played some role in securing funds for the cleanup. *Id.* at 325. In the District Court's assessment, the indication that the official was involved in the cleanup, together with the fact that she worked for the EPA at the time of the relevant events and that the information she might offer at a deposition was "not the type that could be gleaned from rank and file EPA employees," distinguished *Sensient Colors* from *Buono*. *Id.* at 326-27. Viewing the facts in that context, the District Court in *Sensient Colors* concluded that extraordinary circumstances warranted the deposition. *Id.* at 327. Notably, the District Court also observed that the nature of the alleged wrongdoing—that the acts were improperly motivated or performed outside the scope of official duties—bolstered those extraordinary circumstances and the need for the deposition. *Id.* at 327.

Plaintiff argues this action is analogous to *Sensient Colors* because there is a strong inference Mayor Baraka was directing or had some level of involvement in the wrongdoing about which Plaintiff complains. Conversely, Defendants cite the same case to emphasize how starkly different the factual scenario is here, where the record contains no direct evidence that the Mayor was actively involved in the conduct underlying Plaintiff's claims. In the Court's view, neither characterization is precisely accurate.

While the record contains no "smoking gun" evidence that Mayor Baraka directed or played an active role in any of the conduct giving rise to Plaintiff's claims, it also does not place him so far out on the periphery of events that the Court can confidently conclude there is no need for his deposition. As the Court has recounted at length, on two occasions Plaintiff advised the Mayor, in some detail, about allegedly unlawful activities in which high-level employees on his staff were involved. Those activities are the very same activities on which Plaintiff's employment discrimination, workplace harassment, and retaliation claims in this action are based. Plaintiff's meetings with the Mayor, contemporaneous with the events at issue, together with at least one email potentially reflecting his awareness of or involvement in the underlying allegations, constitute the overall series of transactions or occurrences Plaintiff seeks to probe for evidence to prove her claims. In that context, Plaintiff argues, persuasively, that Mayor Baraka's testimony is essential to her effort.

Defendants argue that deposing the Mayor about these meetings is not essential because a deposition will yield no useful information related to Plaintiff's claims, given that she was also present at the meetings and that, in his responses to interrogatories, the Mayor has already denied having any knowledge of the matters about which Plaintiff complained. However, this argument

misses the point. The meetings are undoubtedly part of the sequence of events critical to Plaintiff's claims, and information the Mayor may be able to provide concerning his response, if any, to Plaintiff's reports that members of his team were subjecting her to unlawful workplace conduct and deliberately interfering in the performance of her duties is, in the Court's view, essential to Plaintiff's claims. Thus, insofar as a deposition would be streamlined and narrowed to cover the topic of the meetings and the Mayor's related actions or communications before and/or in response to them, Plaintiff has established that deposing Mayor Baraka is essential to her claims.

3.   <u>Lack of Significant Interference with Duties</u>

The Court will not dwell on this *Buono* factor unnecessarily. During oral argument, Plaintiff agreed that, if permitted to depose Mayor Baraka, she would narrow the deposition in both scope, as described above, and time. Acknowledging that the Mayor of New Jersey's largest city is continuously busy with important duties, the Court finds that two and one half hours to respond to questions about an allegedly years-long pattern of unlawful workplace conduct by senior level employees in the Mayor's administration, of which he was made aware, does not pose an undue burden or significantly interfere with his duties. Moreover, Plaintiff can conduct the deposition in a location convenient to Mayor Baraka, thus further ameliorating any interruption to his schedule.

**C.     Limitations on Deposition under Rule 26(c)**

The Court has determined that Plaintiff has satisfied her burden of demonstrating that extraordinary circumstances exist to overcome the *Morgan* Doctrine's presumption against deposing high-ranking government officials and will accordingly compel Mayor Baraka to

21

appear for his noticed deposition. Therefore, insofar as Mayor Baraka has moved to bar the deposition in total under Rule 26(c), the motion must be denied. However, the Court finds that good cause has been shown to impose appropriate limits, in time and scope, on the deposition, to avoid duplicative discovery and protect the Mayor from undue burden. As the foregoing discussion makes clear, the deposition must be tailored to the matters on which Plaintiff has carried her burden to establish that Mayor Baraka's testimony is not available from an alternative source and essential to her case.

### III.   CONCLUSION AND ORDER

The Court concludes that, for extraordinary circumstances shown, Plaintiff has established that she is entitled to proceed with her deposition of Mayor Baraka. The Court also concludes the deposition must be limited in the manner discussed by the foregoing Opinion. Accordingly,

**IT IS** on this 9th day of April 2024,

**ORDERED** that Defendants' motion for a protective order barring Plaintiff from taking Mayor Baraka's deposition [D.E. 74] is **GRANTED IN PART and DENIED IN PART**; and it is further

**ORDERED** that Mayor Baraka shall appear for the deposition noticed by Plaintiff at a time and place on which the parties mutually agree. Pursuant to Rule 26(c), the deposition shall be limited in accordance with the parameters set by the foregoing Opinion; and it is further

**ORDERED** that the deadline for completing fact discovery is extended to June 10, 2024, for the sole purpose of completing Mayor Baraka's deposition; and it is further

**ORDERED** that the Court will hold a telephonic status conference on **June 13, 2024, at 3:00 p.m.**, to be joined by dialing 973-437-5535, access code 210 356 458#. No later than June 11, 2024, the parties shall file a joint status letter, which proposes a schedule for expert discovery, if any, and/or indicates whether this action may be ready for settlement discussions.

 /s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge